## JOSHUA WALKER *vs.* FERDINAND C. PUE.

*Sale of a Fertilizer—Evidence in an action on a Note given for a Fertilizer, in which an alleged Breach of Warranty was set up as a Defence—Guaranty.*

W. sued P. on a note given by him for three tons of a fertilizer bought by P. and delivered to and used by him, prior to the execution of the note. This note was not paid at maturity, and P. obtained an extension, and it appeared that when the extension was obtained, P. said he would pay it, but nothing intimating any breach of warranty. The defence of P. was, failure of consideration and breach of an alleged warranty given to him, at the time of the purchase, by the agent for the sale of the fertilizer, that it would keep up to its former standard in analysis and preparation for drilling; there having been a previous sale to P. of this fertilizer, application of the fertilizer by him to his crops, and a certificate from him, that it was satisfactory. And as the agent was about to take P's order, P. said to him, that he did not want the fertilizer, unless it would drill all right, and the agent replied, you need not fear, it will do that. After using the fertilizer, P. had a bad crop. No evidence was offered by P. tending to prove a different standard of analysis, but it was proved that the fertilizer was invariably prepared in the same way, by the same formula, and in the same proportions of ingredients. HELD:

That the defence was not good, as P. did not purchase an article unknown to him, it was on the market, and he had used it and tested its qualities, and he purchased the specific article, well knowing what it was, as the one he wished to apply to his crops, all that he required being, that it should be up to the former standard of analysis of that specific article, and of the standard in preparation for drilling, he did not ask any guaranty, that the article would produce a good crop, nor was any such warranty given.

The law does not imply a warranty, where a party selects a specific article, that it will answer the purpose for which it is bought.

Letters of the company which sold the fertilizer and its agents, and of P., relating to the sale and purchase of the fertilizer, and parol

evidence of the contents of other letters written by them with reference to the same subject-matter, notice having been first given to the opposite party to produce them, which notice was not complied with, were admissible in evidence.

Testimony by P., as to the contract between him and the agent for the sale of the fertilizer, with reference to the sale and purchase of that article, and what was said by each of them with respect to the standard of analysis and drilling qualities of the fertilizer, to be delivered to P., was admissible in evidence.

Evidence on the part of P. (in connection with other evidence to prove a breach of warranty and failure of consideration,) of the kind of crops he got from the land to which he had applied the fertilizer in October, 1877, for which the note in suit was given in November following, and that the fertilizer did not produce good crops, offered for the purpose of showing that the article purchased by P., and applied by him to his land, was not up to the standard of the fertilizer of previous years so far as its analysis was concerned, was inadmissible.

If the jury had found that the presumption had been removed by proof from P., that no defect in the drilling qualities of the fertilizer, existed, or that if it did exist, the objection to such defect had been waived by P., then P. would have been entitled to only such deduction from the amount of the note of such sum as the jury should find would be a fair compensation, for the extra labor, expense and loss he had sustained by reason of the bad condition of the fertilizer for drilling.

APPEAL from the Circuit Court for Howard County.

The case is stated in the opinion of the Court.

*Exceptions.*—At the trial, after the taking of the six exceptions, the substance of which is stated in the opinion, the plaintiff offered the following prayers:

1. That the warranty set up by the defendant, is that the fertilizer in evidence mentioned, should equal in analysis and preparation for drilling purposes, the fertilizer sold by plaintiff to this defendant in 1876, if the jury should find such sale in 1876, to defendant.

2. That there is no evidence in the cause, legally sufficient to enable the jury to find that the fertilizer sold defendant in 1877, was not the same in analysis, as that furnished in 1876, if the jury shall find that plaintiff sold fertilizer to defendant, in 1876 and 1877.

3. That if the jury shall find that the fertilizer in question, was not in point of preparation for drilling, equal to the fertilizer sold to defendant in 1876, if the jury shall find such sale in 1876; and shall further find, that said fertilizer was filthy and had dirt in it; and shall further find, that the defendant knew to the full extent, said bad condition as to drilling, and the presence of such dirt and filth, and with such knowledge, signed the note in question, and one year after such signing, promised to pay said note; that then there is evidence legally competent for the jury to infer that the defendant assented to, and agreed to accept said fertilizer in its then condition, in fulfilment of the contract of purchase; and if the jury shall so find, the verdict of the jury must be for plaintiff.

4. That if the jury shall find from the evidence, that the fertilizer sold defendant in 1877, if the jury shall find such sale, was warranted to be prepared so as to be in good condition for drilling, but was not in fact in such good condition, but was dirty and very difficult and laborious to drill; and if the jury shall further find, that in consequence of such bad condition and dirt, defendant was put to labor and cost, and suffered loss in sowing said fertilizer, caused by such bad condition and dirt, that then the verdict of the jury must be for the amount of the note and interest, less such sum as the jury should find would compensate the defendant for the labor, expense and loss caused by said fertilizer being in bad condition for drilling and filthy.

5. That if the jury shall believe from the evidence, that the fertilizer furnished defendant was " Eureka,"

that then the fact that the said fertilizer did not make good crop, or be of any benefit to the land, is not to be considered by the jury in making up their verdict.

6. That if the jury shall find from the evidence that the defendant bought of G. W. Carr, the Eureka Fertilizer, in 1876, and that he bought three tons of the same, in 1877; and shall further find, that the Eureka furnished in 1877, was deficient in preparation to enable it to be readily drilled, that then the verdict by the jury should be for the amount of the note and interest, less such sum as the jury shall find will compensate the plaintiff for the labor, loss and expense incurred in consequence of said defect in drillable qualities, unless the jury shall find that Eureka applied in 1877, was deficient in quality, other than as to drilling qualities compared with that furnished in 1876, and that the burthen of proving such defect, is on the defendant.

7. That if the defendant agreed to execute the promissory note, which is the cause of action in this case, upon the delivery of three tons of "Eureka," by Geo. W. Carr, agent of the Atlantic and Virginia Fertilizing Company, which were warranted to be equal, in point of analysis and preparation for drilling purposes, to "Eureka," furnished to the defendant, in the fall of 1876; that said Carr delivered the three tons of "Eureka" for which said note was given; that the defendant used the said three tons of "Eureka," after full opportunity of inspecting the same, and that the defects of the same, as regards preparation, for drilling purposes, were apparent to defendant, and after so using the same, the defendant executed the said promissory note, then the defendant is estopped from setting up as a defence to this action, any facts alleged to be a breach of said warranty, which were within his knowledge, at the time he executed said note, even though the jury should further find that the said "Eureka" was not as warranted by said Carr.

8. If the jury believe from the evidence, that after the defendant had ascertained the actual drillable condition of the "Eureka" delivered, if they shall find such delivery, and after he had also ascertained the result of the application of the "Eureka" so delivered to his land, he made an express promise to pay the note sued upon in this case, then they must find for the plaintiff, even although they believe the defendant received no benefit from the use of the said "Eureka."

9. That on the pleadings and evidence in this cause, there is no legally sufficient evidence from which the jury can find for the defendant.

And the defendant offered two prayers:

1. If the jury find from the evidence, that the note sued on, was given for three tons of "Eureka," sold by the plaintiff to the defendant, and that at the time of the said sale, the plaintiff guaranteed that the article sold, should correspond in ingredients and preparation to the article called "Eureka," as sold and delivered in previous years; and should be, and was of uniform quality and uniform preparation; and shall further find, that the article as delivered to the defendant, did not correspond in ingredients and preparation with said article called "Eureka," sold the previous years, but was different therefrom, and inferior thereto, in said particulars or either of them, then the defendant is entitled to recoup or deduct from the claim of the plaintiff upon said note, any loss or damage which the defendant may have sustained, if they shall find that the defendant sustained any, by reason of the want of correspondence in the article actually delivered, and the same article, if the same had accorded with said guaranty; and if they find said loss or damage equal or greater, in amount than the amount of said note, then their verdict should be for the defendant.

2. That even though the jury find, that after knowledge by the defendant, of the breach of guaranty, as

described in the foregoing prayer, the defendant promised to pay said note, yet that such promise does not debar him from taking advantage of any defence to this action, he would, or might otherwise, have under the facts stated in the foregoing prayer, if the jury should find said facts as stated.

The Court, (MILLER and HAYDEN, J.,) rejected each and every one of the prayers offered by the plaintiff, and granted the two prayers offered by the defendant; the plaintiff excepted, and the verdict and judgment being for the defendant, the plaintiff appealed.

The cause was argued before BARTOL, C. J., BOWIE, GRASON, ALVEY and ROBINSON, J.

*William P. Maulsby, Jr.* and *John Ritchie,* for the appellant.

The promises to pay the note after full knowledge of the alleged defects in the fertilizer and the gathering of the crop, accompanied too by the deliberate assignment of the hail storm as the cause of loss, were available in one or both of the two aspects, viz : that they were facts competent to go to the jury, from which they could infer that the defence of a failure of consideration was not true; and that the plaintiff was by them, estopped from denying such failure of consideration or breach of warranty, even if there had been such failure and breach.

" Whenever any contract is void, either by a positive law or upon principles of public policy, it is deemed incapable of confirmation. But where it is merely voidable, or turns upon circumstances of undue advantage, surprise or imposition, there it is valid until it is rescinded, and if it is deliberately and upon full examination confirmed by the parties, it will be valid." *Smith's Man. C. L.,* 78; *Story Eq. Juris.,* sec. 306; 2 *Sm. L. C.,* 88, and citations; *Campbell vs. Fleming,* 1 *Ad. & Ell.,* 40; *Selway*

*vs. Fogg,* 5 *M. & W.,* 83 ; See also 1 *Parsons on Contracts,* 593, (6th *Ed.;*) *Milner vs. Tucker,* 1 *C. & P.,* 15 ; *Cash vs. Giles,* 3 *C. & P.,* 407 ; *Percival vs. Blake,* 2 *C. & P.,* 514 ; *Kellogg vs. Denslow,* 14 *Conn.,* 411.

This doctrine is also recognized in 9 *Gill.,* 156 ; 16 *Md.,* 468 ; 1 *Md.,* 437 ; 37 *Md.,* 486.

As to the alleged warranty, it may well be doubted that the recommendation of the agent Carr went beyond what is called "puffing" or promissory statement, in the light of such authorities as *Sawyer vs. Prickett,* 19 *Wallace,* 146.

No authority has been shown in the agent Carr to give a warranty. The mere right to sell does not import the right to warrant. That must be expressly conferred, unless it is implied from the usage of the trade. There is no proof of such express authority or usage in this case. 1 *Parsons on Contracts,* 60 ; 11 *Cush.,* 588 ; 11 *Conn.,* 40.

The defendant knew the article known as " Eureka," had himself used it the year before, and had certified to its excellence; it was a specific article widely used, and well-known to the public by the name of " Eureka ;" had been extensively manufactured and used, before the present company purchased its brand and formula ; and had by them been extensively manufactured, advertised and sold since 1873. The defendant did not apply to the agent to furnish him with an article that would bring him a good crop, nor was there any warranty that it would produce such a result. The defendant ordered the specific article Eureka, only stipulating it should be such Eureka as that he had used before ; in other words Eureka proper ; for as the brand implied, Eureka was a fertilizer of given chemical ingredients or analysis. And when he insisted on its being of the same analysis, that was the test and criterion of the identity of the article he desired and ordered. If then the Eureka furnished him corresponded chemically with the established formula, of which its

11                         v. 57.

name was the synonym, the warranty was fulfilled. That he unquestionably intended to use the Eureka as a ferti-lizer is admitted, but this, though known to the seller, did not imply a warranty that it should answer the purpose. The true rule is laid down in 1 *Parsons on Contracts*, 588; *Mason vs. Chappell*, 15 *Grattan*, 572; *Chanter vs. Hopkins*, 4 *M. & W.*, 399; *Olivant vs. Bailey*, 5 *Ad. & Ell.*, 288; *Prideaux vs. Burnett*, 1 *C. B. (N. S.,)* 613; *Keates vs. Cadogan*, 2 *E. L. & E.*, 320, *S. C.*, 10 *C. B.*, 591; *Bissett vs. Osborne*, 1 *Starkie*, 384; *Gray vs. Cox*, 4 *B. & A.*, 108; *Dickson vs. Jordan*, 11 *Ired. L.*, 166; *Burns vs. Fletcher*, 2 *(Cart.) Ind.*, 372; *Hoe vs. Sarborn*, 21 *N. Y.*, 552; *also* 41 *Md.*, 404.

What was the true analysis of Eureka, or the chemical composition which gave it its fertilizing properties, and which its brand or name of Eureka imported to the public was set forth in the company's circular, and was marked on the bags? While the defendant offered no proof going to the actual composition or analysis of the Eureka sold him, the president, Crenshaw, the foreman, Adams, and the general agent, Walker, all testified that the Eureka gotten by defendant was up to the analysis, and they were confirmed by the experiments or tests applied by Prof. Liebig, referred to in Walker's evidence.

*C. W. D. Ligon* and *James Mackubin*, for the appellee.

The first and third exceptions are to the admission of the correspondence between the appellee and the company. It consists of a letter from the president to appellee, his reply, an answer, and one from appellant, pursuant to a promise expressed in said answer. They contain distinct admissions of the agency of both Carr and the appellant. This had been proved by Carr, but it is no objection to proof, that it is only cumulative. They were also admissible as showing the course of dealings between the parties, and if it be denied that *the first* contributed to either

of these purposes, yet it was necessary to a more correct apprehension of the others, to which it was the initiative. Moreover, it was needed with the others, received and sent by mail, responsive one to the other, in regular sequence, to authenticate them, and to obviate the necessity otherwise of proving signatures. 1 *Greenl. Ev., sec.* 573 *a, pp.* 618–9.

2nd. The contents of appellee's reply had to be proved by parol. That is the ground of this exception. A reply by mail was proved, and *due notice* given for its production, and not being produced when called for, it is inconceivable how the proof of its contents by parol can be objected to. *Evans' Pr.,* 356; *Union Banking Co. vs. Gittings,* 45 *Md.,* 194.

And it is manifest that the appellant was not prejudiced by it, for the next letter says, that the reply was received by the company, and that its contents were as stated by parol. 45 *Md.,* 192.

4th. A guaranty by Carr was objected to, because beyond his agency. But the evidence admitted was of a guaranty *within the terms of the circular* already quoted, which emanating from the fountain head, was sent forth as a letter of credit, authority and instruction to its agents, and a warranty to the public. Upon what principle can the agent's act within that authority be repudiated?

5th. The appellee having proved the guaranty or warranty, that the article to be furnished should be identical or equal in its properties, proportions and preparation, with that of former years, and that it was inferior, visibly, to the ordinary and naked eye, as well as to the touch, and in the use, offered next to prove that it was inferior also, in its effect upon the crops to which it was applied.

It was not an offer to prove, only that it did not fulfil its purpose, and therefore was not what was ordered; but that, as it was not equal to that of the preceding year,

MARYLAND REPORTS.

in its constituent elements, or in its preparation for drill-ing, so neither was it in respect to its effect upon the crops.

The evidence was certainly admissible as affecting the damages, and was offered in that connection, but when interrogated whether offered as tending to prove breach of warranty, it was so claimed and admitted "in connection with all the other evidence in the cause, and the peculiar circumstances of the case." Had this offer been omitted, the appellant would have well said, and triumphantly, "non constat, it did not give you a first rate crop; if it did, that's the best proof; and if it did'nt, would you have said so?"

If there was a guaranty or warranty and a breach, the remedy was three-fold: 1st. The appellee might have refused to accept; 2nd. He might have accepted and paid, and then sued for damages; or 3rd. He was entitled to cut off or recoup, from the price, the damages which he might recover by an independent or cross action. If the damage was equal to, or in excess of the price sued for, then it would be in bar of the suit, and he was entitled so to recoup, though, with full knowledge of all the facts, he had promised to pay, even as he would be entitled to recover in an independent suit for damages, though he had, with full knowledge, not only promised to pay, but actually had paid. *Groff vs. Hansel*, 33 *Md.*, 165-6.

The appellee pursued the last, and the Court, upon his two prayers, instructed accordingly.

These instructions (as said the Court below, in reject-ing the appellant's nine prayers) "contain all the law of the case." And if not only good law, but all—in behalf of the appellant as well as appellee—then were the appel-lant's properly rejected, though one or more were good in themselves. The ninth prayer is a little too general. *Carey vs. Suter*, 36 *Md.*, 4; *Dorry's Ex'rs vs. Harris' Adm'rs*, 22 *Md.*, 88.

The eighth, seventh and third, are at fault, in that they make the promise to pay, after knowledge, a bar to the appellee's right to recoup; the sixth and fourth, because they ignore the injury to the appellee's crops, through the unequal application of the fertilizer; which unequal application was solely attributable to its defective driling condition; the fourth also ignores all proof of inferior ingredients or analysis; the fifth, because the article furnished might have been Eureka, and yet not of a quality and condition to gratify the warranty. If it means that to be Eureka, it must be of the quality and condition represented, then the prayer is at fault in being uncertain and likely to mislead.

The second asserts that there was no evidence legally sufficient to prove deficiency in analysis; or in other words, that no proof short of a chemist's analysis, would be legally sufficient. Such a proposition would leave the farmer, practically, utterly remediless, for not one in a thousand could ever secure such a test; and thus the guaranty, instead of being a protection against, would be made an instrument of fraud.

The first was only introductory to the second and third, and without them was of no avail. And if, by the word "analysis" therein, was meant chemical analysis, as asserted seemingly in the second, then it was at fault, in that it does not give to the warranty set up by the defence, its full and fair scope.

GRASON, J., delivered the opinion of the Court.

The record of this case shows that the appellee, in the year 1876, purchased of the Atlantic and Virginia Fertilizing Company, who were manufacturers of a fertilizer, known in the market as "Eureka," three tons of said fertilizer. The purchase was made from W. G. Carr, the local agent of the company, for Howard County. Joshua Walker, the appellant, being the agent of the company for

the States of Maryland and Pennsylvania. The fertilizer so purchased in the fall of 1876, was used upon the wheat crop of the appellee that fall, and the result was so satisfactory to him, that in August, 1877, he gave a certificate to the appellant, as agent of the company, which was published in their general circular, and in which he stated that he had applied 200 to 250 lbs. of the "Eureka" to his wheat the preceding fall, and that the yield was eighteen and one-half bushels to the acre, which was the best yield he had had for ten years. In the fall of 1877, he purchased of the agent Carr, three tons more of "Eureka," which was applied to his crop of wheat that fall. After it was received and used upon the wheat, which was early in the month of October, the appellee, on the first day of November, 1877, gave a note to Carr for $138, the price of the "Eureka," payable with interest, twelve months after its date. This note was assigned to the appellant, and this suit was brought upon it, and the appellee relied upon failure of consideration, and a breach of an alleged warranty given him at the time of the purchase of the fertilizer, said warranty being that the "Eureka" would keep up to its former standard in analysis and preparation for drilling, and that, as the agent was about to take the appellee's order, the latter said to him, that he did not want the fertilizer unless it would drill all right, and that the agent replied, "you need not fear, it will do that."

During the trial below, several exceptions were taken by the appellant to the rulings of the Court, with reference to the admissibility of evidence. The first four of these were taken to the rulings of the Court below, in admitting in evidence certain letters of the company, its agents and the appellee relating to the sale and purchase of "Eureka," and of parol evidence of the contents of other letters written by the same parties, with reference to the same subject-matter, notice having been first given the

opposite party to produce them, which notice was not complied with. There was no error in these rulings. The fifth exception was taken to the admission of the testimony of the defendant, as to the contract between himself and Carr, with reference to the sale and purchase of the "Eureka," for which the note was given, and what was said by each of them, with respect to the standard of analysis and drilling qualities of the fertilizer to be delivered by the agent to the appellee. This evidence was clearly admissible.

The sixth exception was taken to the admission of proof by the defendant, of the kind of crops he got from the land to which he had applied the "Eureka," in the fall of 1877. This evidence, that the "Eureka" did not produce good crops on the appellee's land, was offered in connection with the other evidence, in the cause to prove a breach of warranty; as well as a failure of the consideration for which the note was given. This evidence was objected to, and the objection ought to have been sustained.

The appellee did not purchase an article of fertilizer, which was unknown to him. It was an article well known to him and on the market, and he himself had used it, and tested its qualities, and he purchased the specific article "Eureka," well knowing what it was. It was sold to him and he purchased this specific article, as the one which he wished to apply to his crops. All that he required, was that it should be up to the standard of analysis of that specific article, and in its preparation for drilling. He did not ask any guaranty that the article should produce a good crop, nor was any such warranty given. Nor will the law imply a warranty, where a party selects a specific article, that it will answer the purpose for which it is bought. In 1 *Parsons on Contracts*, 588 *marg.*, it is said: "This principle (of implied warranty,) has been carried very far. It must, however, be limited to cases where a thing is ordered for a special purpose,

and not applied to those where a special thing is ordered, although this be intended for a special purpose. For, if the thing is itself specifically selected and ordered, there the purchaser takes upon himself the risk of its effecting its purpose." And again it is said, on the same page, "If the thing were not ordered and sold for a special purpose, evidence is inadmissible to show that the buyer, in fact, bought it, intending to apply it to a special purpose, and found it unfit." To the same effect, are the authorities cited in the appellant's brief on this point, and also the case of *Rice vs. Forsyth*, 41 *Md.*, 403 and 404.

There was no express warranty that the article purchased by the appellee would produce a good crop, nor as we have said, will the law imply such a warranty under the peculiar circumstances of this case, when the appellee selected a specific article, which was well known to him and the risk of its effecting the object for which he bought it, he therefore took upon himself. The only warranty was that it should be of the standard analysis of previous years, and of standard preparation for drilling. No evidence whatever was offered by the appellee tending to prove a different standard of analysis, but it was proved by the parties engaged in its manufacture that "Eureka" is invariably made by the same formula and of the same proportions of each ingredient, and that these ingredients are invariably mixed by the same process and in uniform manner. We think there was clearly error in admitting the evidence set out in the sixth exception. We think there was also error in granting the appellee's two prayers, and in refusing the appellant's second, third, fourth, fifth and eighth prayers. We have already stated that the proof of the bad crop made by the appellee on the land to which "Eureka" had been applied was improperly admitted for the purpose of showing that the article purchased by him and so applied, was not up to the standard of "Eureka" of previous years. This proof being out

of the case, there was no evidence tending to prove that the article so purchased was not up to the standard of "Eureka" of previous years, so far as its analysis was concerned. The defendant's first prayer was therefore erroneous, because it submitted to the jury the question whether the article delivered to the appellee, did or did not correspond in *ingredients* and preparation for drilling with "Eureka" sold the previous years, but was different therefrom and inferior thereto in said particulars or either of them. But this prayer as well as the appellee's second should have been refused, and the third, fifth and eighth prayers of the appellant ought to have been granted for other reasons. The fertilizer for which the note was given, was delivered to and used by the appellee early in the month of October, 1877. The note itself was executed and delivered to the appellant early in November, nearly, if not quite a month after the appellee had full knowledge that the "Eureka," so delivered to him, was damp and filthy, and consequently difficult to drill. Yet with such knowledge, he gave the note for the purchase money, without saying anything about the condition of the fertilizer. The following summer or fall he applied to Walker, the company's agent, not to let the note go to protest, and for an extension of the time for payment, who told him that he would arrange so that the note should not be protested; but that he must apply to the company for an extension of time. Accordingly, on the 30th October, 1878, one year lacking a few days from the time the note was given, he wrote to Crenshaw, the president of the company, stating that it would be impossible to meet the note at its maturity, *owing to the fearful hail storm* which had visited his locality in the latter part of April or first of May of the preceding year, which *had destroyed his wheat crop,* and placed him in an embarrassing condition; otherwise his *note would have been paid before maturity,* as was his

practice.   He also stated that he had used nine and three-quarters tons of phosphate, and reaped but 350 bushels of wheat, and then came off better than some others included in the belt of the storm, some of whose losses were total`; and closed his letter with the assurance that he would pay the note as soon as he could make the money.   Not one word was in this letter intimating that there had been any breach of warranty or inferiority in the fertilizer delivered to him by Carr, either as to standard of analysis or preparation for drilling.   He also testified as a witness, that he knew the bad condition of the fertilizer when he signed the note, but made no objection to signing it, and intended to pay it, but made up his mind not to pay it when he received a letter from Walker refusing his offer of a compromise, though he had not made up his mind whether or not to pay it at the time the note matured. He further testified that shortly before the note matured, he had asked Carr if he could get him three or four months' time ; not to let the note go to protest ; that he could not pay it then, because he had lost his crops, but would pay it at the end of three or four months.   He further testified that he had thrashed and sold his crop of wheat at the time he promised to pay the note.   All this evidence was before the jury, and from it they were at liberty to find either that no defect in the drilling qualities of the fertilizer existed, or if it did exist, that the appellee had waived all objection to it.   *Story on Sales,* 554, 556, and the authorities there cited.   The appellant's third and eighth prayers ought to have been granted. But if the jury should find that the appellee had removed such presumption by proof, he was entitled to only such deduction from the amount of the note of such sum as the jury should find would be a fair compensation for the extra labor, expense and loss as he had sustained by reason of the bad condition of the fertilizer for drilling.   The

appellant's fourth prayer should therefore have been granted.

There was error in rejecting the appellant's second prayer. It asked the Court for an instruction, that there was no evidence in the cause legally sufficient to enable the jury to find that the fertilizer sold to the defendant in 1877, was not the same in analysis as that which was sold to him in 1876, if the jury should find such sales in 1876 and 1877. Striking out of the case the evidence as to the short crop of wheat from the land to which the fertilizer was applied in 1877, which we have said was erroneously admitted, there was no evidence tending to prove that the fertilizer furnished the appellee in 1877, was not of the same standard of analysis as that sold him in 1876. On the contrary, the uncontradicted proof given by the parties who manufactured it, showed, that it was.

There was no error in refusing the sixth, seventh and ninth prayers of the appellant. There being error in the rulings of the Court below, in admitting the evidence set out in the sixth exception, and in granting the two prayers of the appellee, and in refusing to grant the second, third, fourth, fifth and eighth prayers of the appellant, the judgment appealed from will be reversed, and a new trial awarded.

*Judgment reversed, and*
*new trial awarded.*