(Superior Court of Cincinnati.)
Special Term, 1890.

CURRAN & WOLF v. HAUSER, KRAMER & COMPANY.

---

Action for the balance of the unpaid purchase money upon a lumber dryer. Defense that dryer was sold with a warranty of fitness; that there was a breach, a tender back, and a rescission. Counter-claim for part of purchase price paid and for damages in loss of lumber ruined in use of dryer. Evidence showed sale was by written contract in which vendor agreed to construct and furnish a dryer made according to vendors' patents of given size; that contract contained no express warranty; that vendor's agent before the signing of the contract by his principal had made verbal representations as to excellence of vendor's dryers without fraud; that vendee had an opportunity to test operation of vendor's dryer; that dryer was constructed according to contract; that it did not dry defendants' lumber and injured a considerable quantity.

Held 1. Verbal representations before the signing of the contract are inadmissible and incompetent to engraft upon the contract an express warranty.

2. Such representations are incompetent to raise the implication of a warranty.

3. No rescission in equity or law can be had for verbal misrepresentations without fraud where the contract has been executed and it is impossible, as in the present case, to restore the parties to the status quo ante.

4. No implied warranty arises in the sale of a definitely described well ascertained article of particular construction that it is fit for the purpose for which vendee buys it, even if such purpose is known to vendor.

---

TAFT, J.

This is an action to recover the balance due on a contract under which plaintiffs erected for the defendant firm a dry kiln for seasoning lumber upon a principle the patent for which belonged to the plaintiffs. Defendant admits the contract, but denies its performance by the plaintiffs. As as second defense, defendant says that "it is a firm engaged in business as coopers in the city of Cincinnati, and as such makes barrels, kegs, vats and other articles ordinarily made by coopers; that in its business, it is necessary to have wood well dried in order that it may be properly worked and that there may be no shrinkage afterwards, and for the drying of wood many kilns have been patented so as to save the time lost in drying of wood by the sun; that the plaintiffs were the makers of a certain drying kiln covered by letters patent, and their agent who was selling the same for them called upon the defendant and represented that the kiln made by the plaintiffs was the kiln needed by the defendant for the drying of wood used in its business.

Said agent was well acquainted with the defendant's business, and knew what kind of wood they needed, and the kiln was sold to the defendant by said agent for the specific purpose of drying wood for the defendant's business. And defendant says that said kiln was an utter and entire failure, and they were not able to dry their wood in it at all."

Then follows an allegation that upon discovery of such failure defendant notified plaintiffs to remove the kiln and demanded repayment of the money already paid under the contract and $2,500 damages for the expense to which defendant had been put in erecting a building for the kiln and for the lumber ruined by defendant in testing the same. For these two amounts, defendant asks judgment by way of counterclaim.

The evidence discloses the following state of fact. Defendant was a firm of coopers in this city engaged in making beer kegs, barrels and vats. The barrels and kegs were made of thick oak staves, and the vats of cypress boards. J. S. Bates visited the members of the firm and stated that he represented the plaintiffs' firm in selling their dry kiln, that it was a much better kiln than the Spear dry kiln which defendant firm was considering the purchase of, and that it would dry the green oak staves and cypress vat sides which were shown to him. He referred the senior member of defendants' firm to a number of persons having plaintiffs' dryer in use, so that by inquiries of his own he might satisfy himself. One of plaintiffs' dryers was in use at the Cincinnati Cooperage Works where it was drying whisky barrel staves and where one member of the defendant firm, at least, had seen it in operation. At the same place, the Spear dryer was in use, and to that defendant had sent some of its own staves to be dried, and they were dried successfully. The members of defendant firm deny that they made any such test of plaintiffs' dryer, although there are some circumstances in the case which indicate that some such test was made. Through their agent plaintiffs were informed of the character of the staves and lumber which defendant wished the kiln to dry. The agent had a circular issued by the plaintiffs which he showed to the members of defendant, dwelling on the excellence of the plaintiffs' dryer, its capacity for drying all kinds of soft and hard wood, and setting out with illustrations the testimonials of persons who were using it. When the plaintiffs' agent had obtained from defendant its consent to take the kiln of plaintiffs, he notified the latter, and a contract signed by plaintiffs was forwarded to defendant for signature. The contract was as follows. "This agreement made the 17th day of June, A. D. 1886, by and between Curran & Wolff of the city of Chicago, and state of Illinois, the sole and exclusive owners of the following patents (then follows a statement of a dozen or more patents by date, number and patentee) of the first part and Hauser, Kramer & Company of Cincinnati in the county of Hamilton, and state of Ohio, of the second part have agreed, and by these presents do agree to sell, grant and convey unto the said party of the second part, the right to construct and use one kiln or dry house, size 22x50 feet each, under the patents as aforesaid, for and within the county of Hamilton, state of Ohio, and to furnish the heating apparatus for the same, according to the specifications on the back thereof, free on board of cars at Chicago' and set up the same at the place of construction. The parties of the second part agree to have the building ready to receive said heating apparatus within thirty days from this date and pay the freight on the said heating apparatus from Chicago to the place of construction. It is agreed that the said party of the second part has a right to move the kiln to any part of Ohio after giving notice to the party of the first part. And the said party of the second part covenants and agrees to pay unto the said parties of the first part for the same the sum of twelve hundred dollars to be paid as follows: $200 on the receipt of the iron materials at Cincinnati, Ohio, and the remaining $900 to be paid by two notes, as follows: a ninety day note for $300, to be given and dated on receipt of iron materials, and a four months note for $600, to be given and dated on completion and acceptance of kiln. And it is further agreed that the title in the kiln is to remain in the vendors till all payments are made as per contract herein stated. In witness whereof, the parties to

these presents have hereunto set their hands and seals the day and year first above written, signed, sealed and delivered in presence of:

Albert J. Hauser,

      Curran & Wolff        (Seal),

John I. Bates.

      Hauser, Kramer & Co.   (Seal).

Upon the back of the contract was an inventory of the various articles to be furnished by plaintiffs in setting up the dry kiln concluding as follows. "Also any article in pipe, fittings, or valves necessary to complete the within mentioned dry kiln according to our plans and specifications. Curran & Wolff also agree to set up in proper place and shape in a good and workmanlike manner, the heating apparatus for said dry kiln and furnish foreman to superintend construction of said kiln, not to exceed thirty days. Plaintiffs constructed the dry kiln as they had agreed to under the contract. The weight of the evidence seems to establish that, upon the staves and lumber of the defendants, the kiln did not work successfully. After the first trial, under directions of plaintiffs, defendant added a steam box to the dryer, but the trouble was not remedied. Defendant paid the $300 cash when the materials were delivered in Cincinnati, and paid the $300 note given at the same time. The note had been negotiated before due. The $600 note never was given. In January defendant notified plaintiffs to remove the kiln and return the $600 already paid. In testing the kiln, defendant attempted to dry lumber amounting in value to $800, and the result was that the lumber became unfit for use.

Two questions arise here. First, were the representations of plaintiff's agent, good ground for a rescission of the contract? Second, was there an implied warranty in the contract that the kiln as constructed should dry the particular kind of lumber used by the defendant in its business? The first question must be answered in the negative for several reasons. The representations, when analyzed, will be found to consist of general statements of the excellence of the plaintiff's kiln contained in the circular, of the opin-

ion of the agent upon the comparative merits of the Curran & Wolff (Plaintiffs') dryer and the Spear dryer, and promises by him that the plaintiffs' dryer would dry the particular size and kind of wood which defendant wished it to dry. The statements of the circular are shown to be true. The opinion of the agents about plaintiffs' machine could not of course be a false representation justifying rescission, first because it was a matter of opinion, and second because, under the circumstances, it was mere dealers' talk. What the agent said to the defendant firm in reference to plaintiffs' kiln drying defendants' lumber was a verbal promise or warranty that it would do so. I do not think it could be construed into a statement of an existing fact. Moreover, no fraud in such representations is either charged or proven. Plaintiffs had fully performed their contract when defendant sought to rescind. A return of the material furnished by plaintiffs tendered by defendant would no more have restored plaintiffs to the condition existing before the contract than a carpenter would be put in statu quo ante by tendering him his lumber, nails and hardware after the house was built. To justify a rescission and return under such circumstances, the representations inducing the contract must have been made with intent to deceive. Bennett's Edition Benjamin on Sales, Pages 390, 863.

Finally, these representations do not constitute a warranty because they are incompetent to prove it. It has sometimes been held that, as the warranty is a collateral undertaking to the main contract, parol evidence is admissible to establish warranty though the terms of the sale are in writing. See 8 Baxter. But by the great weight of authority the rule is that where the parties reduce their contract to writing, no additional warranty can be engrafted on it by parol or the other writings not a part of the formal contract. Thus, in Randall & Stead v. J. & P. Rhodes, 1 Curtis C. C. R., 90, the action was on a warranty in the sale of a ship, that it was of white oak.

It was sought to prove the warranty by a letter from the defendant to the plaintiff containing a representation that the ship was of white oak. Subsequent to the letter, a written contract of sale was signed which contained no reference to the wood of which the vessel was made. Mr. Justice Curtis held that the statement in the letter must be regarded merely as a representation, and not a warranty, and gave no right of action for a breach. See also Kain v. Old 2 B. & C. 627, Lambs v. Craft 12 Metc. 353; Van Ostrand v. Reed 1 Wend. 424; Galpin v. Atwater 29 Conn. 93; Mullane v. Thomas 43 Conn. 252; Reed v. Wood 9 N. 285; Bond v. Clark 35 N. 577; Pender v. Fobes 17 N. C. 250. In the case of Prideaux v. Bennett 1 C. B. N. S. 613, a case very like the one at bar in more respects than this, it was held that no warranty grew out of a circular sent to the purchaser on which he relied in sending in his order, although it appeared that he had no other knowledge of the article bought. It follows therefore, that no warranty is established either by the parol statements of plaintiffs' agent, or by the circular handed by him to defendant.

We come then to the main question in the case, was there an implied warranty of fitness? In the first place, it is well to understand what evidence is competent to assist us in answering this question. The fact that the agent repeatedly said that he would warrant the fitness of the machine must of course be excluded, because it was not put into writing. If it were competent, it would prove an express warranty, not an implied one. Only those facts are competent which are generally competent in construing any written contract i. e. the surrounding circumstances, and of these may be mentioned the fact that plaintiffs knew the particular use for which defendant bought the kiln. Except to show this knowledge by plaintiffs, the conversations between plaintiffs' agent and members of defendant are wholly irrelevant and incompetent. It is a principle in construing contracts of sale that where the vendee orders an article of a manufacturer for a particular purpose, known to the latter, there is an implied warranty, that the article shall be reasonably fit for the purpose. Rodgers & Co. v. Niles & Co. 11 Ohio St., 48; Byers v. Chapin 28 Ohio St., 300; Dayton v. Hoogland 39 Ohio St., 671. Randall v. Newson 2 Q. B. D., 109: There is an exception to this rule, however, stated in Rodgers v. Niles as follows: "Other cases have imposed proper limitations on this doctrine, as in the cases of Chanter v. Hopkins, 4 M. & W. 399; and Olivant v. Bayley 5 Adolphus & Ellis N. S. 288. In these cases it was held that where a known and ascertained article is ordered and furnished, though intended for a particular use, the liability of the maker and vendor extends only to defects in the materials and workmanship, and not to such as arise from the principle or mode of construction." The reason for the exception is not at first apparent. If a man sells an article for a purpose, and impliedly warrants its fitness for the purpose, it would seem that where he sells a principle embodied in an article to effect a purpose, he should impliedly warrant the principle reasonably fit to accomplish the purpose. When we come to examine the rule itself, however, we find that the so called implied warranty is not a warranty at all in the sense of a collateral undertaking as to the quality of the article sold; that it is in fact an implied term in the description of the article itself, and that when an article furnished does not answer the purpose, it simply does not fulfill the contract because it is not the article which is described in the contract when the implied term in the description is supplied. Thus Judge Scott in Rodgers v. Niles quotes from 1 Smith's, Leading Cases 250, upon this feature of the rule as follows: "The sounder view seems to be that no engagement of this sort can be implied against the vendor, save where the contract is partially or wholly executory; and that, in this case, it is not in the nature of a warranty, but of an implied stipulation, forming part of the substance of the contract." And

in Randall v. Newson 2 Q. B. D. 109, where the question was whether there was an implied warranty against a latent defect in a carriage pole, in a very full consideration of all the various so-called implied warranties in sales, Lord Esber M. R. (then Mr. Justice Brett) states the conclusion of the court of appeal as follows: "In some contracts, the undertaking of the seller is said to be only that the article shall be merchantable, in others, that it shall be reasonably fit for the purpose to which it is to be applied. In all it seems to us, it is either assumed or expressly stated, that the fundamental undertaking is, that the article offered or delivered shall answer the description of it contained in the contract. That rule comprises all the others; they are adaptations of it to particular kinds of contracts of purchase and sale. You must therefore first determine from the words used, or the circumstances, what in and according to the contract is the real merchantile or business description of the thing which is the subject matter of the bargain of purchase or sale, or in other words, the contract. If that subject matter be merely the commercial article or commodity, the undertaking is that the thing offered or delivered shall answer that description, that is to say, shall be that article or commodity, saleable or merchantable. If the subject matter be an article or commodity for a particular purpose, the thing offered or delivered must answer that description, that is to say, it must be that article or commodity, and reasonably fit for the particular purpose. The governing principle, therefore, is that the thing offered and delivered under a contract of purchase and sale must answer the description of it which is contained in the words of the contract, or which would be so contained if the contract were accurately drawn out." With this explanation of the doctrine of so-called implied warranty, it is not hard to understand the limitation upon the doctrine that where the mode or principle of construction is specified, in the contract, no implied warranty arises that the principle so ordered

shall be fit and proper for the purpose. For if the principle is in fact unfit for the purpose, and you imply a term describing it as fit, you supply a term which makes the article described an impossible article. In other words, you may be implying a term of description in the contract wholly inconsistent with and contradictory of what has been expressed when the principle or mode of construction is specified. If the term to be supplied were merely a collateral undertaking like a warranty proper the fact that the warranty must fail would perhaps be no objection to implying it. But when it is implied in the substance of the contract as part description of the article itself, it would be manifestly opposed to common sense and reason, from the contract itself and surrounding circumstances to say that the parties tacitly agreed that something should be understood in the description of the article in the contract inconsistent with what is expressly set out. Whether this be the true explanation of the exception or not, the existence of the exception is supported so fully by authority that it is now too late to question it.

Coming now to the facts of the case at bar. I think that the exception to the general rule must apply and that no implied warranty arises that the dry kiln would properly season the particular wood which the defendant firm uses. The contract is in fact the sale of the use of the patents for one dry kiln with an agreement to construct the same in a good and workmanlike manner and to furnish certain necessary materials. No question is made of the good workmanship in the construction or of the character of the materials furnished. If the kiln failed to fulfill defendant's purpose, it was because it was not in principle adapted to dry wood of the size, thickness and hardness of the wood the defendant firm uses. There are four thousand lumber dryers of plaintiff's make and patent in use in the United States. At least one member of the defendant firm had seen such a dryer in use at the Cincinnati Cooperage factory drying oak, whisky barrel

staves. It is very plain that the kiln for the construction of which the contract called was a known and ascertained article and was understood to be such when the contract was signed, by both parties. It follows that no implied warranty of fitness arises. Defendant's counsel contend that the true reason for the rule of implied warranty is in the inequality of opportunity of the parties to inspect and test the article, that in cases where the purchaser is bound to rely upon the judgment of the vendor, the implied warranty arises, and that as the article was not made in the case at bar, and defendant was therefore obliged to rely on plaintiff's judgment without opportunity of inspection or test, an implied warranty does here arise as in other cases. This is true of the construction of the kiln and the materials furnished and if the fault arose from a defect in either, plaintiffs could not recover because the implied term of the description would not have been fulfilled. But plaintiffs were not to make or originate the principle of the machine. That was already known. Defendant was referred by plaintiffs' agent to persons using it. It might easily have satisfied itself of its efficiancy if it desired. It appears that it had sent samples of its wood down to be tested by the Spear machine. There was no good reason why it might not have had a similar test of the Curran & Wolff dryer, except that it was content to rely on a verbal warranty or rather representation of plaintiff's agent that it would do their work. As we have shown, no defense can be predicated on these verbal statements not inserted in the contract. The failure to insist upon having the warranty in the contract was where "the defendant firm made its mistake", to use the candid language of one of its members upon the stand. The opportunity of defendants to test the principle which they were buying the use of, is what distinguishes the case at bar from the case of Kellogg Bridge Co. v. Hamilton, 110 U. S., 108, so much relied upon by defendant's counsel. In that case, the plaintiff company had partially executed a contract for the execution of the bridge, and in doing so had driven false work into the bed of the river for the further construction of the bridge when defendant Hamilton agreed to take the contract off their hands and to assume and pay for all work, done and material furnished up to that time by the company. No representation was made by the company as to the quality of the work it had done. On completing the work, the false work put in by the company was found to be improperly driven. This was not apparent on inspection. It was held that the law implied a warranty that the false work sold by the company to Hamilton was reasonably sufficient for the purpose for which the company knew it was designed, on the ground that the bridge company held itself out as competent to properly drive false work and no inspection of the mode pursued in driving the piling being then possible, Hamilton was obliged to rely on their judgment. From these circumstances it could be inferred that the parties tacitly intended such a warranty.

An examination of the authorities where the warranty of fitness is not implied because the mode of construction is specified, shows that the present case comes clearly within the exception which they support, to the general rule of implied warranty.

In Chanter v. Hopkins, 4 M. & W., 399, the defendant sent to the plaintiff the patentee of an invention known as Chanter's Smoke Consuming furnace the following written order: "Send me your patent hopper and apparatus to fit up my brewing copper with your smoke consuming furnace. Patent right 15 L. 15 s.; iron work not to exceed 5 L. 55; engineer's time fixing 7 s. 6 d. per day." The plaintiff accordingly put up on the defendant's premises one of his patent furnaces, but it was found not to be of any use for the purposes of a brewery, and was returned to the plaintiff. It was held that no fraud being imputed to the plaintiff, that there was not an implied warranty on his part that the furnace supplied should be fit for the purposes of a brewery; but that the

defendant having defined by the order the particular machine to be supplied, the plaintiff performed his part of the contract by supplying that machine, and was entitled to recover the whole price.

In Olivant v. Bayley, 5 Adolphus & Ellis N., 5 288, plaintiff was the patentee and manufacturer of a two colour printing machine which was called "Olivant's Patent Printing Machine". The defendant, a cotton printer, called at plaintiff's premises and said he wanted a two colour printing machine. An estimate was sent him next day. He called again and ordered a two colour machine on plaintiff's patent principle. Plaintiff gave the following memorandum in writing. "I undertake to make you a two color printing machine on my patent principle (stating dimensions and prices) "of course it is understood that you do the masonry, etc." The machine was put up on plaintiff's premises, but failed, the colors running into each other and soiling the work. The defendant's witnesses stated that for this reason, it was of no use as a two color machine, and that defect was inseparable from a machine constructed as those of the plaintiff were. The judge in summing up told the jury if the machine described was a known ascertained article ordered by the defendant, he was liable, but if not, and plaintiff merely agreed to supply a machine printing two colors, then the defendant was not liable unless the instrument was reasonably fit for the purpose. The jury found for the plaintiff, and the verdict was upheld by the court of Queen's Bench on the principle of Chanter v. Hopkins. There is no extended judgment, but the reason for the action of the court is clearly been in the remarks of the judges during the argument. Thus Wrightson, J., says to counsel: "The plaintiff's undertaking here is expressly 'to make you a two color printing machine on my patent principle.'" To which counsel replies: "still the contract is, substantially, to supply an instrument which shall be reasonably fit for printing in two colors; to which Wrightson, J., makes the following

significant rejoinder: "You contend that, if the principle is not really adapted to the purpose, he must send something not according to the principle." This remark really contains the suggestion I have already made, that the contention of the counsel there as here is that a term must be implied in the description inconsistent with the express provision that it should be made on a certain principle. Of course, this could not be done, and therefore, as Lord Denman finally and in effect says: "The purchaser may have taken the risk of the usefulness of the principle; he may be supposed to have examined it" although the evidence showed he had not done so.

In Prideaux v. Bennett, 1 C. B. N. S., 613, the defendant sent to the plaintiff, the patentee of a smoke preventing valve, an order for his valve, giving the dimensions required, by the furnace door, and referring in the order to a circular received from the patentee with blanks to be filled by the intending purchaser. The circulars and cards contained representations of the excellence of the invention and what it would do. Defendant had never seen the article itself. In an action for the price, defendant proved that the article sent was a complete failure, and relied on an implied warranty that it should be a smoke preventing value as a defense. It was held that as an ascertained patented article was ordered, and as that was supplied, the contract had been fulfilled, and the full price must be paid. See also Wilson v. Dunville, 4 Irish Law Reports, 249, where Pallis C. B. gives a lucid explanation of the distinction I am here making. These authorities have been followed in this country.

Mason v. Chappell, 12 Grattan, 572; Rice v. Forsyth, 41 Md., 103; Rasin v. Conley, 58 Md., 59; Cosgrove v. Bennett, 32 Minn., 371; Walker v. Pue, 57 Md., 155; Tilton Safe Co. v. Tisdale, 48 Vt., 83; Port Carbon Iron Co. v. Grovers, 68 Pa. St., 149; Douace v. Dow, 64 N. Y., 411; McGraw v. Fletcher, 35 Mich., 104.

I think the case at bar can not be distinguished from the cases cited. It

follows that plaintiffs are entitled to the contract price for the dry kiln. The $600 ncte for the balance unpaid was to be dated and given when defendant accepted the machine. Defendant never did accept the machine. The plaintiffs having complied with their contract, the defendant can not be permitted to defeat recovery. The $600 was due when they ought to have accepted the machine which was in November. The machine, was completed earlier, but plaintiffs waived their right to the ncte then by consenting that the time for giving it might be postponed until November. In addition to the six hundred dollars paid, defendant has also paid $35.00. The judgment must therefore be for $565 with interest from November 22nd, 1886.

For the same reasons the counter-claim of defendants must be dismissed.

Judgment accordingly.