ARMOUR FERTILIZER WORKS *vs.* ELLIS LOGAN.

Aroostook.    Opinion February 3, 1917.

*General rule as to admissibility of certain testimony relating to crops and failure*
*of same where fertilizer is sold on a guaranty basis only, or where it has been*
*sold under a guaranty of suitability of results of fitness for the soil.*
*R. S., 1916, Chap. 36, interpreted.*

1.   The printed statement required by statute, R. S., (1916) Chap. 36, to be
     affixed before sale to lots or packages of commercial fertilizer, giving a chemical
     analysis stating the minimum percentage of nitrogen or its equivalent of
     ammonia in available form, of potash soluble in water, of phosphoric acid in
     available form, soluble and reverted and of total phosphoric acid, is a guaranty
     of the percentages of those ingredients as printed in the statement, but it is
     not a guaranty of suitableness, nor of results.

2.   When, in an action to recover the price of commercial fertilizer sold, the
     defense set up is a breach of the guaranty as to percentages of nitrogen, potash
     and phosphoric acid stated in the printed statement affixed to the packages as
     required by R. S., (1916), Chap. 36, evidence of crop failure following the use
     of the fertilizer is not admissible for the purpose of showing that the percentages
     were less than those stated in the guaranty.

3.   Upon the evidence, the court finds that there was no breach of the guaranty
     of the commercial fertilizer sold by the plaintiff to the defendant.

Action of assumpsit upon a promissory note given by defendant in
payment of certain amount of fertilizer sold to defendant by plaintiff
Company.   Defendant pleaded general issue and also filed brief
statement, setting forth in substance that the consideration named in
the note declared upon had failed; that the consideration for said
note was fertilizer bought of the plaintiff corporation by the defend-
ant, with a warranty that the same was of a certain grade and quality;
that the warranty was not true and that the defendant thereby was
greatly damaged and in the action claims to set off his damages
against the said note.   At close of testimony, by agreement of parties,
case was reported to the Law Court to be determined by the court

upon all the legally admissible testimony and such judgment to be rendered as the legal rights of the parties require. Judgment for plaintiff.

Case stated in opinion.

*Pierce & Madigan, Powers & Guild, and W. S. Lewin,* for plaintiff.

*R. W. Shaw, and Hersey & Barnes,* for defendant.

SITTING: SAVAGE, C. J., CORNISH, BIRD, HALEY, HANSON, JJ.

SAVAGE, C. J. Assumpsit upon a promissory note given in payment for fifteen tons of commercial fertilizer prepared and sold by the plaintiff. The fertilizer was delivered to the defendant from the plaintiff's storehouse in Houlton, in the Spring of 1914. It was of the brand known as Armour's "Blood, bone and potash, 5-8-7." It was prepared in Chrome, New Jersey, and was shipped in bulk by barge from Chrome to Bucksport, Maine, in October, 1913, and in barrels by rail from Bucksport to Houlton in November. It was then placed in the storehouse and remained there until sold and delivered to the defendant the following Spring.

The defendant pleaded the general issue; and by way of brief statement alleged that the consideration for the note failed; that the fertilizer to pay for which the note was given was warranted to be of a certain grade and quality; that the warranty was not kept; and that thereby the defendant was damaged. The case comes before this court on report.

The defendant claims that the fertilizer was guaranteed to contain certain definite percentages of nitrogen, available phosphoric acid, and potash soluble in water, and that the fertilizer sold and delivered was deficient in all three of these particulars. Thereupon the defendant contends that the sale was made in the violation of statute, and that, for that reason, the plaintiff cannot recover. He also contends that he is, in any event, entitled to recoup in damages.

The contention of the defendant will be understood better if we refer to the statute regulating the sale of commercial fertilizers. R. S., (1916) Chap. 36, (which prior to the last revision was Chap. 119, of the laws of 1911). Section 1 provides that,—"No person shall, within this State, manufacture, sell  .  .  .  .  commercial fertili-

zer   .   .   .   .   which is adulterated or misbranded within the meaning of this chapter." By Section 6 it is provided that,—"Every lot or package of commercial fertilizer which is   .   .   .   .   sold   .   .   .   . in the State shall have affixed in a conspicuous place on the outside thereof a plainly printed statement clearly and truly giving the number of net pounds in the package,   .   .   .   and a chemical analysis stating the minimum percentage of nitrogen, or its equivalent of ammonia in available form, of potash soluble in water, of phosphoric acid in available form, soluble and reverted, and of total phosphoric acid." Section 8 requires the dealer before any sale is made, to file with the commissioner of agriculture, for each brand, a certified copy of the statement mentioned in Section 6. Section 12 declares that commercial fertilizer shall be deemed to be "adulterated," "if its weight, composition, quality, strength or purity do not conform in each particular to the claims made upon the affixed guaranty." By Section 13 the term "misbranded" is made to apply to commercial fertilizer, "the package or label of which shall bear any statement, design or device regarding such article or the ingredients or substances contained therein which shall be false or misleading in any particular." Sections 15 and 16 provide for the analysis of fertilizers, either as determined by the commissioner of agriculture, or at the request of any person within the State. By Section 21 sales in violation of any provision of the Chapter are made punishable by fine.

It is admitted that a printed statement was actually affixed to the barrels bought by the defendant, as required by statute. A corresponding statement was certified by the plaintiff to the Maine Agricultural Experiment Station. The "blood bone and potash" fertilizer was certified to contain not less than 4.11% of nitrogen, or its equivalent, 5% in ammonia, 8% of available soluble and reverted phosphoric acid, total phosphoric acid 8.50%, and 7% of potash soluble in water. From these figures comes the legend "5-8-7." This printed statement affixed to each barrel was the guaranty for breach of which the defendant claims the right to recoup. And because of his claim that the fertilizer contained less than the percentages named in the statement or guaranty, the defendant insists that the fertilizer was adulterated within the meaning of the statute, that the plaintiff was forbidden to sell adulterated fertilizer and

that it or its agent is punishable by fine for selling it; and hence that the transaction was unlawful, and that the plaintiff cannot recover.

The crucial question is one of fact; it is, whether the percentage of one or more of the three ingredients referred to was lower than that guaranteed. The defendant, presented evidence of three classes:— First, that his own potato crop in 1914 which had been fertilized with the "5-8-7" which he bought yielded only 40 barrels to the acre, and that less than half of these were marketable; next, that some of his neighbors whose lands were near, or contiguous to his own, and some of them similarly situated, used substantially like amounts per acre of the same brand of fertilizer, taken from the same barge load, and experienced the like unsatisfactory result of a small crop; and lastly that he caused to be analyzed in February, 1915, a sample made by mixing some of the contents of two of his own barrels, two of Mr. Moore's, and one of Mr. Parks, both near neighbors, and that the analyses of the composite sample showed the nitrogen to be only 3.41%, the available phosphoric acid, 6.57%, the total phosphoric acid, 7.77%, and the potash 6.09%, all lower than the guaranty.

All this evidence must be viewed with reference to a single point, namely the percentages of nitrogen, phosphoric acid and potash, because nothing else was guaranteed, and no other guaranty is pleaded or relied upon. There was no guaranty of suitableness, nor of results from the use of the fertilizer. *Philbrick* v. *Kendall*, 111 Maine, 198. It is not questioned that the analysis of the fertilizer was competent evidence upon the precise issue involved. Of that we will speak later. But the plaintiff contends that neither of the other classes of evidence is admissible upon this issue. It objected to the evidence when offered, and although the case was reported after the evidence was taken out, it was reported with the stipulation that it was to be determined "upon all of the admissible testimony." By this we are bound to consider only so much of the testimony as would be admissible in a trial before a jury.

The objection to the first class, the defendant's own experience, is that the proof is too uncertain, and too speculative or conjectural, to throw any real light upon the percentages of the ingredients of the fertilizer. The plaintiff claims, and truly, that the growth of a crop of potatoes depends upon many factors, the knowledge and ability of the grower himself, the previous preparation of the land, its culti-

vation during the growth of the crop, the selection of seed, and whether it had been properly stored, the presence or absence of insect pests, the means taken to destroy them, the physical structure of the land, the suitableness of the soil, the previous rotation of crops, the weather, and the fertilizer. The plaintiff says that until all other factors have been determined, a crop failure cannot properly be attributed to a deficiency in the guaranteed percentages of the ingredients of the fertilizer, and that it is not evidence from which percentages can be determined. And it has been held that such evidence is inadmissible when the fertilizer was sold on a guaranteed analysis basis only. *Walker* v. *Pue*, 57 Md., 155; *Germofert Mfg. Co.* v. *Cathcart*, 104 S. C., 125: 88 S. E., 535.

With this view we agree. Had there been a guaranty of suitableness, or of results, the evidence would undoubtedly be admissible to be considered with the other factors. But how could a jury say, or how can we say, or what basis is there for saying, that because there was a poor crop, it is proof that there was less than 4.11% of nitrogen, or 5% of ammonia? And so of the other ingredients. It might, under some conditions, demonstrate that the fertilizer was not fit for that land, but it does not prove or disprove percentages. We might as reasonably say that it is proof that 4.11% nitrogen was not enough for the defendant's land. In reality it is proof of neither. It is not proof. It is a guess. It is an assumption based upon a hypothesis. The hypothesis is that fertilizer containing the guaranteed percentages would have produced a good crop. The assumption is that, because the crop was poor, therefore the percentages were under those guaranteed. See *Scott & Company* v. *McDonald*, 83 Ga., 28.

The second class of evidence, the poor crops of the plaintiff's neighbors, must fall with the first, and for the same reason. And if this were not enough, it is objectionable for the reason that it leads to too many collateral issues. Not only would all the factors of plant growth in each instance become subjects of inquiry, but the plaintiff would have the right to show instances where good crops had resulted, and then all their factors would become subjects of like inquiries. There might be as many issues as there are factors in all of the instances. And they would be issues, too, of which the other party had no notice, and could not be prepared to rebut. 1 Greenl. on Ev.,

Sec. 52; *Moulton* v. *Scruton,* 39 Maine, 288; *Parker* v. *Portland Pub. Co.,* 69 Maine, 173; *Branch* v. *Libbey,* 78 Maine, 321; *Lincoln* v. *Taunton Copper Mfg. Co.,* 9 All., 181.

The purchaser of fertilizer, however, is not without the means of testing and proving satisfactorily the percentages of the essential ingredients in the fertilizer he buys. A chemical analysis is the most satisfactory test. The statute provides that he may have an official analysis made under the direction of the commissioner of agriculture. R. S., (1916), Chap. 36, Sec. 16. And it provides further in Section 18, that "if the actual analysis shall differ materially from the guaranteed analysis" the analysis fee shall be returned to him. Such an analysis the defendant caused to be made, and it was introduced in evidence in this case, as already stated.

On the other hand, the plaintiff showed the process of the manufacture of the barge load from which the fertilizer in question was taken. It appears that in the process certain materials were used, like dried blood, sulphate of ammonia, packing house tankage, phosphate residue, manure salts, muriate of ammonia and others. These materials supplied the nitrogen, phosphoric acid and potash. They were mixed according to formulas. And the formulas called for sufficient materials of the various classes to produce the guaranteed percentages, and sand enough was put in to make the required weight. The fertilizer was mixed, a ton at a time. After the mixing means were taken to get a fair average sample of the mass. And this was analyzed. The evidence of the plaintiff tends to show theoretically that the fertilizer when shipped was up to the guaranty.

But we do not place entire reliance upon this species of proof. There were opportunities for error. It was admitted that in some instances the plaintiff made no analysis of the raw material on its own account, but assumed that the analysis made by the party selling to it was correct. Besides, there was opportunity for mistakes, or worse, by some of the many men that were employed in the process. If they were faithful, and if the purchase analysis was correct, the product should have corresponded with the formula; otherwise it might not.

The plaintiff, however, relies confidently upon six analyses made by the chemist of the Maine Agricultural Experiment Station of samples which came out of the same barge load as the defendant's did. They were all taken by official inspectors. The first is an

analysis of a sample taken from ten barrels in the storehouse at Houlton in March, 1914, which was about the time the defendant bought his fertilizer; the second, of a sample taken in the Spring of 1915, from Mr. Carr's barrel, one of the five which made up the defendant's sample already referred to; the third, of a sample taken May 1, 1915 from one barrel in Amity (Estabrook); the fourth, of a sample taken May 18, 1915, from five barrels in Fort Fairfield (Hopkins); the fifth, of a sample taken May, 1915, from five barrels in Hodgdon (Varney); and the sixth, of a sample taken May, 1915, from two barrels in Ludlow (Dobbins). In all of these analyses, except the first, the moisture content is stated. The moisture content is important in making comparisons. The case shows that the normal moisture content of this fertilizer is about 9%. If the percentage of moisture is increased, necessarily the percentages of the other ingredients in a ton's weight will be lessened proportionally.

We give in tabulated form the various analyses, including the defendant's.

| No. | Nitrogen | Phosphoric acid (available) | Potash | Moisture |
|---|---|---|---|---|
| 1 | 4.10% | 9.20% | 7.34% | |
| 2 | 3.86% | 8.14% | 6.34% | 16.52% |
| 3 | 3.91% | 7.55% | 6.98% | 12.83% |
| 4 | 3.96% | 7.49% | 7.03% | 13.85% |
| 5 | 3.74% | 7.71% | 6.92% | 15.7 % |
| 6 | 4.08% | 7.14% | 6.95% | 11.94% |
| Defendant's | 3.41% | 6.57% | 6.09% | 16.30% |

The evidence leaves no doubt that the fertilizer absorbed moisture after it was brought into the State. And the analysis of the fertilizer in the storehouse in April, 1914, indicates that most if not all of the increase in the moisture content occurred after that time. As the fertilizer was then in barrels and was sold by weight in the condition it then was, the subsequent increase in moisture did not affect in any way the qualities of the other ingredients, and should not be considered as affecting other percentages. In other words the computations of actual percentages must be made with reference to the

moisture content when this particular fertilizer was sold. The
storehouse analysis, No. 1, indicates that the moisture percentage
was then normal. We think it should be regarded as 9%. Com-
puting the various analyses upon a 9% moisture basis we have the
following results:—

| No. | Nitrogen | Phosphoric acid (available) | Phosphoric acid (total) | Potash |
|---|---|---|---|---|
| 1 | 4.10% | 8.03% | 9.20% | 7.34% |
| 2 | 4.02% | 8.70% | | 6.91% |
| 3 | 4.08% | 7.88% | | 7.03% |
| 4 | 4.18% | 7.91% | | 7.41% |
| 5 | 4.  % | 8.31% | | 7.46% |
| 6 | 4.20% | 7.36% | | 7.18% |
| Average | 4.09% | 8.03% | | 7.22% |
| Defendant's | 3.70% | 7.14% | 7.77% | 6.62% |

The figures in these tabulations are gathered from the testimony
of Dr. Bartlett, chemist at the Maine Agricultural Experiment Sta-
tion, who made all the analyses, and who was called as a witness for
the defendant. But Dr. Bartlett says that a margin must be allowed
for experimental error, that no laboratory can be sure of getting a
correct result within two-tenths of one percent, and that his analyses
should come within one-tenth for nitrogen, three-tenths for available
phosphoric acid, two-tenths for total phosphoric acid, and two-tenths
for potash. We think this allowance should be made by us for
experimental error. Making this allowance, all of the analyses except
the defendant's are up to the guaranty with the exception of the
phosphoric acid in No. 6. And the same would be true if the per-
centages were computed on the basis of 10% moisture.

It is impossible to disregard the probative effect of these analyses.
They were official. The samples were collected by the department of
agriculture. They all came from the same barge load. When taken
by the inspectors they were scattered over a large section of territory.
We cannot avoid the conclusion that they fairly represent the mass
from which they came.

What, then, was the matter with the defendant's sample? Why
did it differ so much from the others? We do not know and it is

idle to speculate. Shortly after this sample was analyzed, the commissioner of agriculture sent an inspector to obtain samples from each of the five barrels from which the defendant's sample was taken, namely, two of his own, two, belonging to Mr. Moore, and one, to Mr. Carr. The defendant refused to permit a sample to be taken from his own barrels, and Mr. Moore's fertilizer had been mixed with ashes. The inspector took a sample from the remaining barrel, Mr. Carr's, which is No. 2 in the tabulation. We do not say that the defendant acted in bad faith. But we say that his action, unfortunately perhaps for him, made it impossible to find out what was the matter with his fertilizer as to percentages.

We conclude that the plaintiff is entitled to recover on the note.

*Judgment for the plaintiff.*